**IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA**

MARTIN E. O'BOYLE,
MARTIN E. O'BOYLE, JR.
    Plaintiffs,
vs.

50   2010 CA 0 1 2 7 0 1 XXXX MB

CASE NO.

SOUTH JERSEY PUBLISHING
COMPANY f/k/a/ ABARTACORP, d/b/a
THE PRESS OF ATLANTIC CITY
and PRESSOFATLANTICCITY.COM
    Defendants.



_____/

**SUMMONS**

THE STATE OF FLORIDA:
To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and a copy of the complaint or petition in this action on Defendant(s):

~~THE PRESS OF ATLANTIC CITY and~~ PRESSOFATLANICCITY.COM

**By Serving:**

**SOUTH JERSEY PUBLISHING f/k/a ABARTACORP**
1000 West Washington Avenue   *1000 Gramma Dr. C.*
Pleasantville, NJ 08232   *Pittsburgh, PA 15238*

    Each defendant is hereby required to serve written defenses to the complaint or petition, on plaintiff's attorney, **BARRY M. SILVER, ESQUIRE,** whose address is: 1200 South Rogers Circle, Suite 8, Boca Raton, Florida 33487 within 20 days after service of this summons , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

DATED ON _____ MAY 11 2010

SHARON R. BOCK
Clerk & Comptroller

Clerk of Court,
    As Clerk of said Court

COURT SEAL

By_____
as Deputy Clerk

SHARON R. BOCK
Clerk & Comptroller
P.O. Box 4667
West Palm Beach, Florida
33402-4667

**Composite Exhibit A**

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

MARTIN E. O'BOYLE,
MARTIN E. O'BOYLE, JR.
        Plaintiffs,                                   CASE NO.:   502010CA012701XXXXMB AB
vs.

SOUTH JERSEY PUBLISHING
COMPANY f/k/a/ ABARTACORP, d/b/a
THE PRESS OF ATLANTIC CITY
and PRESSOFATLANTICCITY.COM
        Defendants.
_____/

## SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of the State:

YOU ARE COMMANDED to serve this summons and a copy of the complaint or petition in this action
on Defendant(s):

### SOUTH JERSEY PUBLISHING f/k/a ABARTACORP, d/b/a
### THE PRESS OF ATLANTIC CITY

**By Serving:**

### SOUTH JERSEY PUBLISHING f/k/a ABARTACORP
### 1000 Gamma Drive
### Pittsburgh, PA  15238

Each defendant is hereby required to serve written defenses to the complaint or petition, on
plaintiff's attorney, BARRY M. SILVER, ESQUIRE, whose address is:  1200 South Rogers Circle,
Suite 8, Boca Raton, Florida 33487 within 20 days after service of this summons, exclusive of the day of
service, and to file the original of the defenses with the Clerk of this Court either before service on
Plaintiff's attorney or immediately thereafter.  If a defendant fails to do so, a default will be entered
against that defendant for the relief demanded in the complaint or petition.

DATED ON ___JUN 1 4 2010___

                                    Clerk of Court,
                                            As Clerk of said Court

COURT SEAL

                                    By_____EDNA SMITH_____
                                    as Deputy Clerk

SHARON R. BOCK
Clerk & Comptroller
P.O. Box 4667
West Palm Beach, Florida
33402-4667

## IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA

MARTIN E. O'BOYLE,
MARTIN E. O'BOYLE, JR.
    Plaintiffs,

vs.

    CASE NO.   50   2010CA 012701XXXX NB

SOUTH JERSEY PUBLISHING
COMPANY f/k/a/ ABARTACORP, d/b/a
THE PRESS OF ATLANTIC CITY
and PRESSOFATLANTICCITY.COM
    Defendants.

_____/

COPY
RECEIVED FOR FILING
MAY 1 1 2010
SHARON R. BOCK
CLERK & COMPTROLLER
CIRCUIT CIVIL DIVISION

### COMPLAINT FOR DEFAMATION

COMES NOW the Plaintiff, MARTIN E. O'BOYLE (hereinafter "O'BOYLE"), and MARTIN E. O'BOYLE, JR. (hereinafter O'BOYLE, JR.) by undersigned counsel and sues the Defendants SOUTH JERSEY PUBLISHING COMPANY d/b/a THE PRESS OF ATLANTIC CITY, INC. and THEPRESSOFATLANTICCITY.COM (hereinafter "THE PRESS") and states:

1.    This case involves a claim by Plaintiff for damages in excess of $15,000, exclusive of costs, interest and attorney's fees.

2.    At all times material hereto, Plaintiff O'BOYLE was, and is sui juris and a resident of Palm Beach County, Florida.

3.    At all times material hereto, Plaintiff O'BOYLE, JR. was, and is sui juris and a resident of Pennsylvania.

4.    At all times material hereto, Defendants THE PRESS were, and are, Pennsylvania corporations, and news outlets that distribute and disseminate news in Palm Beach County, Florida, both as a newspaper and as an online version of the newspaper which appears all over the country and has its headquarters in Pennsylvania.

5.    At all times material hereto, O'BOYLE was and is a private citizen who takes interest in the affairs of his community, and, like all citizens should, strives to hold government accountable in order to protect the community from fraud, government waste, and corruption.

6.    At all times material hereto, O'BOYLE JR. was and is a private citizen who takes interest in the affairs of his community, and, like all citizens should, strives to hold government accountable in order to protect the community from fraud, government waste, and corruption.

7.  THE PRESS printed two defamatory articles about the Plaintiff O'BOYLE. The first such article appeared in The Press of Atlantic City on March 15, 2010 and was titled, "PART TWO: Lawyers, engineering firms, political operatives far outnumber average citizens in OPRA requests" written by Michael Clark, who wrote this article while working in the course and scope of his employment with Defendants. The second article appeared in the Press of Atlantic City on March 16, 2010, was titled "Sen. Jim Whelan wants to put more N.J. records online" and was written by Eric Scott Campbell, while working in the course and scope of his employment with the Defendants. Both of these articles appeared simultaneously or shortly thereafter in the online version of THE PRESS, and these articles appeared all over the country, including in Palm Beach County, Florida.

8.    Pursuant to Florida Statute 770.01 as well as analogous statutes in New Jersey, on April 8, 2010, Plaintiff sent a letter demanding a retraction of the defamatory articles to the Defendants, in a letter which is attached hereto and incorporated herein as Exhibit A.

9.  To date, Defendants have failed to print a retraction or even to respond to Exhibit A.

10. The statements are defamatory in that they both portray Plaintiff in a false light and they are false statements of fact.

11. The first article is entitled "Lawyers, engineering firms, political operatives far outnumber average citizens in OPRA requests". It prominently features Plaintiff O'BOYLE as a person making OPRA requests, and falsely claims that he is abusing the process. Since O'BOYLE is not a lawyer or an engineering firm, according to the article, by process of elimination, O'BOYLE must be a "political operative", which has an extremely negative connotation, since most people today have a negative opinion of politicians, and the term "political operative" is a very highly charged pejorative term, which falsely characterizes the Plaintiff and places him in a false light.

12. The false statements about Plaintiff and the false light in which he is depicted in the first article include, but are not necessarily limited to:

a) Plaintiff's photograph was included with the caption, "'That's about as close to busting (chops) as you can get. I'm going to do it solely for a point,' Longport homeowner Martin O'Boyle says of his plans to file all of his OPRA requests in one form, giving the borough seven days to comply."

This quote was formed from two separate statements taken completely out of context. Additionally, the contention that Plaintiff planned to give the borough only seven days to comply with a combined OPRA request is in direct contrast to what Plaintiff actually told the reporter, Michael Clark. The misuse of these words portrays the Plaintiff in a false light.

In addition, the Defendants knew the words were false because they possessed a tape of what the Plaintiff actually said, but intentionally chose to misquote him in order to

defame the Plaintiff but make it a more salacious story in order to attract more readers and thus increase profits.

b)   The statement "But finding something specific may not be the goal of some public-document seekers.  For Martin O'Boyle, it's about bulk" falsely indicates that Plaintiff does not seek specific information with his requests and that his goal is merely to send as many requests as possible in order to harass the government and its employees.

c)   Mr. Clark states that "he (referring to Plaintiff) criticized the Borough for its inability to properly respond to his requests." This statement is untrue and defamatory.

d)   Mr. Clark's article states that the O'Boyle family was cited for zoning violations. This is untrue and defamatory.

e)   The article states that "Longport officials say O'Boyle is using OPRA to intimidate and harass employees." This statement is untrue and defamatory.

f)   The article stated that "O'Boyle eventually admitted that not all of his requests are for vital information." This is untrue and defamatory.

g)   The article stated that "O'Boyle's dissatisfaction with the Borough's response to his requests has led to new plans for him to file all of his requests in one OPRA form, technically giving Longport officials just seven days to comply with dozens of requests under the law." This statement is untrue and defamatory.

h)   The article says that O'Boyle stated "That's about as close to busting chops as you can get."  This statement was taken out of context, and the rest of the statement was omitted in order to create a false impression and place the Plaintiff in a false light. Thus, this statement is defamatory.

     i)    The article says that O'Boyle stated, "I'm going to do it solely to for a point." This statement was taken out of context in order to create a false impression and to place the Plaintiff in a false light. Thus, the statement is defamatory.

     j)    The article claims that O'Boyle stated, "If they're doing things wrong and their conduct is affecting you and/or your family, why can't you do it forever?" This statement is untrue, casts Plaintiff in a false light, and is therefore defamatory.

13.    The statement that is defamatory in the second article includes, but are not necessarily limited to the statement that O'Boyle is on a "crusade to 'bust chops' in Longport Borough Hall." This statement is false, places Plaintiff in a false light, and is defamatory. Moreover, this statement reinforces the defamatory statements made in the first article, and by its repetition, increases the harm to the Plaintiff from both articles.

14.    The second article also begins to take on a life of its own, and reinforces the negative effect of the first article, since people tend to remember and believe statements that are repeated in the press, even if they are false on both occasions.

15.    Moreover, in the minds of some people, the word "crusade", which was used to describe Plaintiff's activities in the second article, has an especially negative connotation, since it is often associated with people who are irrational, blinded by emotion, religious zealots, and dangerous to others.

16.    The second article also defamed O'BOYLE JR. in that it referred to Martin O'Boyle and his family. O'BOYLE JR. is a member of Citizens for Open Government, LLC, which requests government documents and records seeking to hold government accountable.

17.   When the Defendants referred to MARTIN O'BOYLE, in the mind of the public this applied to both of the Plaintiffs, since they are both involved in similar activities and have similar names. This perception in the mind of the public that the defamatory comments referred not only to O'BOYLE, but also to O'BOYLE JR., was reinforced when the Defendants referred to O'BOYLE and his family in the second article.

18.   All of the defamatory statements described above, were also disseminated by the Defendants via the internet by the Pressofatlanticcity.com, which reinforced the negative impact of these statements by repetition, which for some increases their believability.

19.   As a result of the defamatory statements described herein, the Plaintiffs have been harmed, and suffered damages which include, but are not limited to emotional distress from his being defamed and demeaned along with his family, loss of reputation, loss of business opportunities and income, and other unspecified damages.

20.   All conditions precedent have been met prior to bringing this cause of action, including but not limited to compliance with the notice provision of Florida Statute 770.01. Thus, Plaintiff seeks all damages provided by Fla. Stat. 770.01 et seq.

21.   The Plaintiffs have retained the undersigned to represent him in this matter and has agreed to pay him a reasonable fee for his services.

WHEREFORE, Plaintiffs demand damages, plus interest, costs, attorney's fees, and any other remedy deemed just and proper by this Honorable Court.

BARRY SILVER, ESQ.  FBN#382108
1200 South Rogers Circle    Suite 8
Boca Raton, Florida
(561) 483-6900



**COMMERCE GROUP**

■ ■ ■ ■

moboyle@commerce-group.com
Direct Dial Telephone #954-570-3505

April 8, 2010

<u>VIA UPS DELIVERY #1Z986W8Y0190243285</u>
<u>TELEPHONE #609-272-7000</u>

Press of Atlantic City
1000 West Washington Avenue
Pleasantville, NJ 08232

Re:    OPRA Series – Week of March 15, 2010

Dear Ladies and Gentlemen:

Please accept this letter as a written demand that The Press of Atlantic City and the Pressofatlanticcity.com (individually and collectively referred to as "The Press") print a Retraction (as defined below) in connection with those portions of the articles in the OPRA series featured on Monday March 15, 2010 (the "First Article") and Tuesday, March 16, 2010 (the "Second Article").

Demand is made that The Press, publish an article or articles containing a full and fair correction, apology, or retraction ("Retraction") within ten (10) days in the same editions or corresponding issues of the newspaper or periodical in which said article[s] appeared and in as conspicuous place and type as said original article.

The articles in question were titled "PART TWO: Lawyers, engineering firms, political operatives far outnumber average citizens in OPRA requests" by Michael Clark and "Sen. Jim Whelan wants to put more N.J. records online" by Eric Scott Campbell.

Among the reasons for the Retraction are, *inter alia*:

A. Regarding the first article, "PART TWO: Lawyers, engineering firms, political operatives far outnumber average citizens in OPRA requests":

(1) My photograph was included with the caption, "'That's about as close to busting (chops) as you can get. I'm going to do it solely for a point,' Longport

Press of Atlantic City
April 8, 2010
Page 2

---

homeowner Martin O'Boyle says of his plans to file all of his OPRA requests in one form, giving the borough seven days to comply." The quote was formed from two separate statements taken completely out of context. Additionally, the contention that I plan to give the borough only seven days to comply with a combined OPRA request is in direct contrast to what I actually told the reporter, Michael Clark. The words above were also used within the text of the article. The misuse of these statements which I believe was intentional, portrays me in a false light and is defamatory.

(2) The statement "But finding something specific may not be the goal of some public-document seekers. For Martin O'Boyle, it's about bulk" indicates that I do not seek specific information with my requests and that my goal is merely to send as many requests as possible. These assertions are untrue and defamatory.

(3) Mr. Clark states that "he (referring to Martin O'Boyle) criticized the Borough for its inability to properly respond to his requests." This statement is untrue and defamatory.

(4) Mr. Clark's article alleges that the O'Boyle family was cited for zoning violations. This is untrue and defamatory.

(5) In the article, the writer states "Longport officials say O'Boyle is using OPRA to intimidate and harass employees". This statement is untrue and defamatory.

(6) The statement "O'Boyle eventually admitted that not all of his requests are for vital information" was untrue.

(7) "O'Boyle's dissatisfaction with the Borough's response to his requests has led to new plans for him to file all of his requests in one OPRA form, technically giving Longport officials just seven days to comply with dozens of requests under the law". This statement is untrue and defamatory.

(8) "That's about as close to busting chops as you can get" O'Boyle said. "I'm going to do it solely for a point". This statement was made out of context, is defamatory, is untrue (as presented) and presents me in a false light.

(9) "If they're doing things wrong and their conduct is affecting you and/or your family," he said, "why can't you do it forever?" This statement is untrue and defamatory.

Press of Atlantic City
April 8, 2010
Page 3

_____

B.      Regarding the Second Article, entitled, "Sen. Jim Whelan wants to put more N.J. records online":

(1) In the article by Mr. Campbell, the author states that I am on a "crusade to 'bust chops' in Longport Borough Hall."  This statement clearly frames me in a false light, has no basis in fact, and defames me.

The above list should not be construed to be all inclusive; but, as you can see, they demonstrate that, at a minimum, The Press owes me and my family a Retraction.  The bases for each of the statements above are for illustration purposes and should  not be construed to be limited.  As stated above, I believe the misuse of the statements enumerated herein were done intentionally.

We sincerely hope that The Press will recognize its improper conduct and issue the appropriate Retractions in a timely fashion.

We thank you for your consideration.  We look forward to your "righting this wrong".

Sincerely yours,

_____
Martin E. O'Boyle


cc:     Neill Borowski, Executive Editor – Via Telecopy #609-272-7280
        Michael Clark, Staff Writer – Via Telecopy #609-272-7224
        Keith Dawn, Publisher – Via Telecopy #609-272-7413

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

MARTIN E. O'BOYLE, et al.,

    Plaintiffs,

vs.                         Case No.: 50 2010 CA 012701 XXXX MB

SOUTH JERSEY PUBLISHING
COMPANY f/k/a ABARACORP,
d/b/a THE PRESS OF ATLANTIC
CITY and PRESSOFATLANTICCITY.COM

    Defendants.
_____/

## **NOTICE OF APPEARANCE**

    Carol Jean LoCicero and Deanna K. Shullman of Thomas & LoCicero PL hereby give

notice of their appearance as counsel on behalf of .the Defendants SOUTH JERSEY

PUBLISHING COMPANY f/k/a ABARACORP, d/b/a THE PRESS OF ATLANTIC CITY and

PRESSOFATLANTICCITY.COM.  The certificate of service for all pleadings, orders, and other

papers in this action should include **Carol Jean LoCicero** and **Deanna K. Shullman** at Thomas

& LoCicero PL, 400 North Ashley Drive, Suite 1100, Tampa. Florida 33602.

                    Respectfully submitted,

                    THOMAS & LOCICERO PL

                    Carol Jean LoCicero
                      Florida Bar No. 603030
                      400 N. Ashley Drive, Suite 1100
                      Tampa, FL 33602
                      Telephone: (813) 984-3060
                      Facsimile:  (813) 984-3070
                      clocicero@tlolawfirm.com

                    and

Deanna K. Shullman
  Florida Bar No. 0514462
8461 Lake Worth Road, Suite 242
Lake Worth, FL 33467
Telephone:  (561) 340-1433
dshullman@tlolawfirm.com

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished on this _8th_ day of July, 2010, via ☐ E-Mail; ☒ U.S. Mail; ☒ Facsimile; ☐ Overnight Delivery to Barry M. Silver, Esq., 1200 S. Rogers Circle, Suite B, Boca Raton, FL  33487.

Attorney

2

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

MARTIN E. O'BOYLE, et al.,

    Plaintiffs,

vs.                            Case No.: 50 2010 CA 012701 XXXX MB

SOUTH JERSEY PUBLISHING
COMPANY f/k/a ABARACORP,
d/b/a THE PRESS OF ATLANTIC
CITY and PRESSOFATLANTICCITY.COM

    Defendants.

_____/

## MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Pursuant to Florida Rule of Civil Procedure 1.140(b)(6), Defendant South Jersey Publishing Company, f/k/a AbartaCorp, d/b/a The Press of Atlantic City and PressofAtlanticCity.com (collectively "The Press" or "Defendant"), move to dismiss the Complaint filed by Plaintiffs Martin O'Boyle ("Mr. O'Boyle") and Martin O'Boyle, Jr. ("Mr. O'Boyle, Jr."). The Complaint purports to state a cause of action for defamation, but it fails to do so. Grounds for this Motion are set forth below:

### Background

1.      As its name suggests, *The Press of Atlantic City* is a newspaper of general circulation in southern New Jersey, including the greater Atlantic City metropolitan area. The Press also operates a related website, pressofatlanticcity.com. The website and newspaper are owned and operated by South Jersey Publishing Company.

2.      Plaintiffs sue The Press over two newspaper articles that were published in the *The Press of Atlantic City* on March 15 and 16, 2010, which were part of the newspapers'

Sunshine Week coverage.[1]  (Compl. ¶ 7.)  Articles also appeared online.  Both Plaintiffs have sued The Press for defamation.

3.      The March 15, 2010, article discussed, among other things, Mr. O'Boyle's hundreds of public records requests to the Borough of Longport, where Mr. O'Boyle is a homeowner, and statements made by Mr. O'Boyle about those public records requests.  (Compl. ¶ 12.)

4.      The March 16, 2010, article primarily discussed efforts by a New Jersey state legislator to get more of New Jersey's public records online and briefly mentioned Mr. O'Boyle's activity in Longport as part of the story.  (Compl. ¶¶ 7, 13-15.)

5.      On or about April 8, 2010, Mr. O'Boyle sent The Press a written demand for retraction on his company's letterhead.  That letter addressed allegedly defamatory statements about him only, and did not address any allegedly defamatory statements about his son, Mr. O'Boyle, Jr.  (Compl. Ex. A.)  Mr. O'Boyle, Jr. is not a signatory on the letter.

6.      For a variety of procedural and substantive reasons, discussed in greater detail below, the Complaint fails to state a claim for defamation and should be dismissed.

### Argument

7.      When considering a motion to dismiss, this Court must take the facts alleged in the Complaint as true, and must draw all reasonable inferences in favor of Plaintiffs.  But where, as here, the Complaint fails to allege facts sufficient to state a claim for relief or is deficient as a matter of law, the Complaint should be dismissed.

8.      Moreover, cases involving First Amendment rights are particularly suited for motions to dismiss.  Pretrial disposition in First Amendment cases is especially appropriate

---

[1] "Sunshine Week is a national initiative to open a dialogue about the importance of open government and freedom of information."  About Sunshine Week, http://www.sunshineweek.org/About.aspx, last visited on August 5, 2010.

"because of the chilling effect these cases have on freedom of speech." Stewart v. Sun-Sentinel Co., 695 So. 2d 360, 363 (Fla. 4th DCA 1997).

**I.   The Complaint Fails to Satisfy Basic Procedural Requirements And Jurisdictional Conditions Precedent.**

    **A.   The Amended Complaint Must Be Dismissed For Failure To Attach Either Article.**

9.   Florida Rule of Civil Procedure 1.130(a) requires that, if a claim is based upon a written document, then that document must be incorporated in or attached to the complaint. Fla. R. Civ. P. 1.130(a). Failure to attach such documents subjects the complaint to dismissal for failure to state a cause of action. See, e.g., Contractors Unlimited, Inc. v. Nortrax Equip. Co., 833 So. 2d 286, 288 (Fla. 5th DCA 2002) (plaintiff fails to state a cause of action until documents upon which claim is based are attached to the complaint).

10.   In this case, the pending claims are based upon two newspaper articles published by The Press. However, Plaintiffs have failed to attach these articles to the Complaint. Accordingly, Rule 1.130 requires dismissal. Defamation actions are based on words in context. It is critical that Plaintiffs include the precise articles, in full, upon which they sue.

11.   Plaintiffs' recitation of selected portions of the articles in the Complaint is insufficient. Analysis of defamation claims requires an assessment of whether the subject publication – *taken as a whole, including words, headlines and pictures* – is defamatory. Byrd v. Hustler Magazine, Inc., 433 So. 2d 593, 595 (Fla. 4th DCA 1983); Wolfson v. Kirk, 273 So. 2d 774 (Fla. 4th DCA 1973). Only by seeing the articles as a whole and in context will the Court be able to assess fully the Plaintiffs' pleading. Accordingly, Plaintiffs' failure to attach the articles to the Complaint warrants dismissal for failure to state a cause of action.

    **B.   Mr. O'Boyle, Jr. Has Completely Failed To Comply With The Notice Provisions In Chapter 770, A Jurisdictional Prerequisite.**

12.     Section 770.01, Florida Statutes contains a five-day notice provision that must be fulfilled before commencing a defamation action against a media defendant. This provision requires a plaintiff to provide media defendants with written notice of "the specific article or broadcast and the statements therein which he or she alleges to be false and defamatory." § 770.01, Fla. Stat. (2009).

13.     Compliance with this notice provision is a jurisdictional condition precedent to the very filing of a defamation action. Ross v. Gore, 48 So. 2d 412, 415 (Fla. 1950); Gifford v. Bruckner, 565 So. 2d 887, 888 n.1 (Fla. 2d DCA 1990); Davies v. Bossert, 449 So. 2d 418, 419 (Fla. 3d DCA 1984). In other words, if a plaintiff has not served adequate notice in accordance with the detailed requirements of Section 770.01, then no cause of action even existed at the time of filing the complaint. The defect – because it is jurisdictional – cannot be cured by amendment. Orlando Sports Stadium, Inc. v. Sentinel Star Co., 316 So. 2d 607, 610 (Fla. 4th DCA 1975). A plaintiff must satisfy the statute, then file a new action.

14.     To comply with the statute, the notice must identify with particularity each of the statements alleged to be false and defamatory so that the would-be defendant has a full opportunity to analyze the claims and make corrections if appropriate. See, e.g., Nelson v. Associated Press, Inc., 667 F. Supp. 1468, 1474 (S.D. Fla. 1987); Hulander v. Sunbeam Television Corp., 364 So. 2d 845, 847 (Fla. 3d DCA 1978); Gannett Fla. Corp. v. Montesano, 308 So. 2d 599, 599-600 (Fla. 1st DCA 1975); Orlando Sports Stadium, Inc., 316 So. 2d at 610. Despite Plaintiffs' failure to attach the articles upon which the Complaint is based, on the face of the Complaint, Plaintiffs have failed to satisfy Section 770.01's dictates.[2]

15.     Plaintiffs' purported notice is wholly inadequate as to Mr. O'Boyle, Jr. because the notice is only from and pertaining to the senior Mr. O'Boyle, not the son. Thus, Mr.

---

[2] Plaintiff's 770.01 notice is attached to the Complaint as Exhibit A.

4

O'Boyle, Jr. must be dismissed from this lawsuit because the Court lacks subject matter jurisdiction over the claims he has brought.  Mr. O'Boyle, Jr. must himself satisfy the requirements of Chapter 770 and explain which statements he claims are false with respect to him directly.

16.    Moreover, not all of the statements upon which Plaintiffs attempt to base their complaint are referred to in the senior Mr. O'Boyle's April 8, 2010, letter.  Specifically, the allegations in Paragraph 11 are completely absent from Exhibit A.  Thus, this portion of the Complaint should be dismissed with respect to both father and son.

17.    Because this Section 770.01 deficiency cannot be cured by amendment, the only remedy for the Section 770.01 failures is dismissal.  E.g., Orlando Sports Stadium, 316 So. 2d at 610.  Particularly with respect to Mr. O'Boyle, Jr., until the very specific requirements of Chapter 770 are satisfied, the claim is premature.

**II.    The Complaint Must Be Dismissed Because It Fails To State A Cause Of Action.**

18.    To state a cause of action for defamation, Plaintiffs must allege the following elements: (1) a publication of and concerning Plaintiffs; (2) containing a false and defamatory statement of fact; (3) that is not privileged; (4) that is published with fault amounting to at least negligence on the part of the publisher; and (5) damages.  Thomas v. Jacksonville Television. Inc., 699 So. 2d 800, 803-04 (Fla. 1st DCA 1997).

**A.    The Statements Complained Of Are Not "Of And Concerning" Mr. O'Boyle, Jr.**

19.    To state a cause of action for defamation, Plaintiffs must allege that the Defendants published a defamatory, false statement of fact that is *of and concerning* each of them.  Thomas, 699 So. 2d at 804.

20.     On the face of the Complaint, it is clear that the articles reference only Mr. O'Boyle and not his son, Mr. O'Boyle, Jr. – nowhere in the statements complained of is the suffix "Jr." or "Junior" used nor are facts included that suggest that Mr. O'Boyle, Jr. is even involved in the record requests.

21.     Moreover, the Complaint plainly states that the Mr. O'Boyle being referred to is "Longport homeowner Martin O'Boyle" (Compl. ¶ 12(a)), whereas Mr. O'Boyle, Jr. is a resident of Pennsylvania (Compl. ¶ 3), not a homeowner in New Jersey.

22.     Under Plaintiffs' theory, anyone in the world named Martin O'Boyle, whether junior, senior, III, or without a suffix to their name, could bring suit for an article that uses the name Martin O'Boyle.  That simply is not the law.

23.     In fact, the "of and concerning" element is of constitutional import. See, e.g., McIver v. Tallahassee Democrat, Inc., 489 So. 2d 793, 794 (Fla. 1st DCA 1986) (citing New York Times Co. v. Sullivan, 376 U.S. 254 (1964), and Rosenblatt v. Baer, 383 U.S. 75 (1966), for the proposition that the "of and concerning" requirement is constitutionally-mandated).  Accordingly, the statements complained of must be "specifically directed at the plaintiff." Rosenblatt v. Baer, 383 U.S. 75, 81 (1966).  The plaintiff must be the "direct object" of the allegedly defamatory statement. Id.; Blatty v. N.Y. Times Co., 728 P.2d 934, 1183 (Cal. 1986).

24.     Mr. O'Boyle, Jr. is neither expressly identified nor identified by clear implication.  (Perhaps, this is the reason he did not provide pre-suit notice.)  Therefore, the constitutionally-mandated "of and concerning" element has not and cannot be satisfied.

25.     Accordingly, the defamation claim by Mr. O'Boyle Jr. must also be dismissed for failure to state a claim.

6

**B.     Many Of The Statements Are Not Defamatory As A Matter of Law.**

26.     The courts play a "prominent function" in defamation cases by determining as a matter of law if the complained of statement is reasonably capable of defamatory meaning at an early stage in the litigation, such as on motions to dismiss.  Byrd v. Hustler Magazine, Inc., 433 So. 2d 593, 595 (Fla. 4th DCA 1983) (citing Wolfson v. Kirk, 273 So. 2d 774, 778 (Fla. 4th DCA 1973).

27.     A statement is defamatory which "exposes a person to distrust, hatred, contempt, ridicule or obloquy or which causes such person to be avoided, or which has a tendency to injure such person in his office, occupation, business or employment." Rapp, 699 So. 2d at 803 (quoting Cooper v. Miami Herald Publ'g Co., 31 So. 2d 382, 384 (Fla. 1947)).  In other words, a defamatory statement is one that naturally and proximately injures a plaintiff.  Byrd, 433 So. 2d at 595.

28.     The proper method for determining if a statement is defamatory is the "common mind" test.  E.g., Byrd, 433 So. 2d at 595.  The words should not be interpreted by the Court "in their mildest or most grievous sense...." Loeb v. Geronemus, 66 So. 2d 241, 245 (Fla. 1953). "In other words, the statement should be considered in its natural sense without a forced or strained construction." Byrd, 433 So. 2d at 595.

29.     Applying these basic principles of interpretation, many of the statements at issue fail to meet this stringent standard on the face of the Complaint.

30.     First, in Paragraph 11, Plaintiffs' claim that the March 15, 2010, article implies that Mr. O'Boyle is a "political operative" and that this term has an "extremely negative

connotation" and "is a highly charged pejorative term, which falsely characterizes the Plaintiff and places him in a false light."[3]

31.     Such a construction of the article, taken as a whole, is strained – as the Court could more easily see if Plaintiffs had properly attached the full articles sued upon.  The term "political operative" appears in the sub-head to a long article in which Mr. O'Boyle is not mentioned for some time.  Moreover, being referred to as a "political operative" is not defamatory using the "common mind" test.  Such a term merely refers to those engaged in politics.  Surely it is not defamatory to describe someone's profession or lawful activities.  It would be far from defamatory, for example, to call someone a doctor or lawyer and, similarly, it is not defamatory to refer to someone engaged in the political process as a political operative. See, e.g., DeMoya v. Walsh, 441 So. 2d 1120, 1120 (Fla. 3d DCA 1983) (calling someone a "'raving maniac' and 'raving idiot' ... may have been personally insulting, but did not constitute actionable slander").  The Court should dismiss this action with respect to any claims based on the "political operative" language in the sub-head of the article, which is language that on its face is not defamatory.

32.     Second, neither is it defamatory for someone to say that he is going to exercise his full legal rights, give public officials a hard time, and expect public officials to fulfill their legal duties.  The statement "'[t]hat's about as close to busting (chops) as you can get.  I'm going to do it solely for a point,' Longport homeowner Martin O'Boyle says of his plans to file all of his OPRA requests in one form, giving the borough seven days to comply" merely expresses those sentiments, albeit in Mr. O'Boyle's own colorful language.  (Compl ¶ 12(a); see also Compl. ¶ 12(h)-(i).)  This too falls far short of being defamatory.

---

[3] Plaintiffs also repeatedly claim to have been cast in a false light.  (Compl. ¶¶ 10-13.)  The Florida Supreme Court rejected recognition of the tort of false light in 2008.  Rapp, 997 So. 2d at 1114.

33.     Next, the following statements also fail to meet that legal standard of having a

defamatory meaning on their face:

- "But finding something specific may not be the goal of some public-document seekers.  For Martin O'Boyle, it's about bulk." (Compl. ¶ 12(b));

- "he (referring to Plaintiff) criticized the Borough for its inability to properly respond to his requests" (Compl. ¶ 12(c));

- "Longport officials say O'Boyle is using OPRA to intimidate and harass employees." (Compl. ¶ 12(e));

- "O'Boyle eventually admitted that not all of his requests are for vital information." (Compl. ¶ 12(f));

- "O'Boyle's dissatisfaction with the Borough's response to his requests has led to new plans for him to file all of his requests in one OPRA form, technically giving Longport officials just seven days to comply with dozens of requests under the law." (Compl. ¶ 12(g)); and

- "If they're doing things wrong and their conduct is affecting you and/or your family, why can't you do it forever?" (Compl. ¶ 12(j)).

Again, Mr. O'Boyle is entitled to employ whatever legal methods he chooses – including making

hundreds of records requests -- to seek government information.  Describing such actions cannot

be defamatory.

34.     Finally with respect to the defamatory meaning analysis, Mr. O'Boyle also takes

issue with the description that he is on a "crusade to 'bust chops' in Longport Borough Hall."

(Compl. ¶ 13.)  Like the term "political operative," Plaintiffs take issue with use of the word

"crusade" and attempt to define it in an extreme manner.  (Compl. ¶ 15.)  A crusade, besides its

use as a historical reference, simply means "[a] vigorous concerted movement for a cause or

against an abuse."  The American Heritage Collegiate Dictionary 342 (4th ed. 2007).  Making

hundreds of public records requests is certainly a vigorous and concerted movement to push for

open government and, thus, a type of crusade.  This is hardly a defamatory statement.

9

35.     The statements Plaintiffs based their Complaint upon do not expose Plaintiffs to distrust, hatred, contempt, ridicule or obloquy and cannot be construed by the common mind as being defamatory.  As a matter of law, these statements cannot be deemed defamatory.

**C.     Plaintiffs Failed to Plead the Requisite Level of Fault for Most of the Allegedly Defamatory Statements.**

36.     There is no strict liability for libel.  In fact, it is a constitutional imperative that Plaintiffs plead and prove fault on The Press' behalf.  Thomas, 699 So. 2d at 803-04.  See also, Gertz v. Robert Welch, Inc., 418 U.S. 323, 347-48 (1974) (private individuals cannot be held strictly liable in defamation cases for statements involving matters of public concern); N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964) (public officials are constitutionally required to prove the "actual malice" level of fault in order to recover in defamation action).

37.     If the statements are about a public figure, such as Plaintiffs, the requisite level of fault is "knowledge or reckless disregard as to the falsity." [4] Jews for Jesus v. Rapp, 997 So. 2d 1098, 1106 (Fla. 2008) (citing Restatement (Second) of Torts §§ 558B, 580A-580B).

38.     Construing the pleading in the light most favorable to Plaintiffs, of the multiple statements complained of, only three arguably include any fault standard.  (Compl. ¶¶ 12(a), (h)-(i)).  Pleading and proving fault, however, is fundamental and the appropriate fault standard must be pled for each statement.  (Compl. ¶¶ 11, 12(b)-(g), (j), 13.)

39.     For example, in Paragraph 12 (e), Plaintiffs claim that "[t]he article states that 'Longport officials say O'Boyle is using OPRA to intimidate and harass employees.'  This statement is untrue and defamatory."  There is no pleading of fault for this allegedly false and defamatory statement in this paragraph or anywhere else in the Complaint.

40.     This same failure is repeated in Paragraphs 11, 12(b)-(g), 12(j), and 13.

---

[4] If the person is a private figure, then the level of fault must be at least negligence.  Rapp, 997 So. 2d at 1106. Plaintiffs have likewise failed to plead even negligence.

41.     As a result, the Complaint fails to plead an essential element of a defamation claim and, therefore, fails to state a cause of action for defamation for the specified statements. For this reason too, the Complaint should be dismissed.

### Conclusion

The pleading and proof requirements for defamation claims are exacting, and Plaintiffs must meet these requirements, as well as satisfy all conditions precedent to bringing this action. For the many reasons stated here, the Complaint must be dismissed.

WHEREFORE, The Press respectfully requests that this Court dismiss the Complaint.

Respectfully submitted,

THOMAS & LOCICERO PL

Carol Jean LoCicero
   Florida Bar No. 603030
Paul R. McAdoo
   Florida Bar No. 0036219
400 N. Ashley Drive, Suite 1100
Tampa, FL 33602
Telephone: (813) 984-3060
Facsimile:  (813) 984-3070
clocicero@tlolawfirm.com
pmcadoo@tlolawfirm.com

and

Deanna K. Shullman
   Florida Bar No. 0514462
8461 Lake Worth Road, Suite 242
Lake Worth, FL 33467
Telephone:  (561) 340-1433
dshullman@tlolawfirm.com

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished

on this _10ᵗʰ_ day of August, 2010, via ☐ E-Mail; ☒ U.S. Mail; ☐ Facsimile; ☐ Overnight

Delivery to Barry M. Silver, Esq., 1200 S. Rogers Circle, Suite B, Boca Raton, FL  33487.

_____

Attorney

12

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

MARTIN E. O'BOYLE, et al.,

    Plaintiffs,

vs.                        Case No.:  50 2010 CA 012701 XXXX MB

SOUTH JERSEY PUBLISHING
COMPANY f/k/a ABARTACORP,
d/b/a THE PRESS OF ATLANTIC
CITY and PRESSOFATLANTICCITY.COM,

    Defendants.

_____/

## DEFENDANT'S MOTION TO STRIKE
## PLAINTIFFS' REQUEST FOR INTEREST AND ATTORNEYS' FEES

Pursuant to Florida Rule of Civil Procedure 1.140(f), Defendant South Jersey Publishing

Company, f/k/a AbartaCorp, d/b/a The Press of Atlantic City and PressofAtlanticCity.com

(collectively "The Press" or "Defendant") moves to strike Plaintiffs' request for interest and

attorneys' fees in the Complaint.  In support of this Motion, The Press states:

    1.      Florida Rule of Civil Procedure 1.140(f) allows a party to move to strike

"redundant, immaterial, impertinent, or scandalous matter" from a pleading.  Fla. R. Civ. P.

1.140(f).  A matter is redundant, immaterial, impertinent, scandalous or a sham and may be

stricken from a pleading if it is "wholly irrelevant" and "can have no bearing on the equities and

no influence on the decision."  Rice-Lamar v. City of Ft. Lauderdale, 853 So. 2d 1125 (Fla. 4th

DCA 2003) (citations omitted).

    2.      A motion to strike is the proper method for challenging improperly pled items of

damages, such as interest and attorneys' fees.  Augustine v. S. Bell Tel. & Tel. Co., 91 So. 2d

320, 323 (Fla. 1956); William v. Bay Hosp. Inc., 471 So. 2d 626, 630 (Fla. 1st DCA 1985).

3.      In this case, Plaintiffs have improperly pled interest and attorneys' fees.

4.      Recovery of attorneys' fees is proper when there is a statutory or contractual basis for such recovery.  Stockman v. Downs, 573 So. 2d 835, 837 (Fla. 1991).

5.      In this case, however, there is no statutory or contractual basis for recovery of attorneys' fees and the request in the prayer for relief should be stricken.

6.      Likewise, there is no basis for recovery of interest and that request should also be stricken.

WHEREFORE, The Press respectfully requests that this Court strike Plaintiffs' request for interest and attorneys' fees in the Complaint and grant The Press such other relief as the Court deems proper.

Respectfully submitted,

THOMAS & LOCICERO PL

Carol Jean LoCicero
   Florida Bar No. 603030
Paul R. McAdoo
   Florida Bar No. 0036219
400 N. Ashley Drive, Suite 1100
Tampa, FL 33602
Telephone: (813) 984-3060
Facsimile:  (813) 984-3070
clocicero@tlolawfirm.com
pmcadoo@tlolawfirm.com

and

Deanna K. Shullman
   Florida Bar No. 0514462
8461 Lake Worth Road, Suite 242
Lake Worth, FL 33467
Telephone: (561) 340-1433
dshullman@tlolawfirm.com

2

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished

on this _10th_ day of August, 2010, via ☐ E-Mail; ☒ U.S. Mail; ☐ Facsimile; ☐ Overnight

Delivery to: Barry M. Silver, Esq., 1200 S. Rogers Circle, Suite B, Boca Raton, FL  33487

_____

Attorney

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT IN AND FOR
PALM BEACH COUNTY, FLORIDA

MARTIN E. O'BOYLE,
MARTIN E. O'BOYLE, JR.
    Plaintiffs,            CASE NO.: 502010CA12701XXXXMBAB
vs.

THE PRESS OF ATLANTIC CITY, INC.
and PRESSOFATLANTICCITY.COM
    Defendants.
_____/

## ORDER SETTING SPECIAL SET HEARING ON MOTION TO DISMISS
## PLAINTIFF'S COMLPAINT

THIS CAUSE having come on before the Court, is specially set to be

heard on **FRIDAY, NOVEMBER 19, 2010 at 1:30 p.m.**, before the Honorable

Donald Hafele, Palm Beach County Courthouse located at 205 N. Dixie Highway,

Room 11B, West Palm Beach, Florida. **Time reserved is thirty (30) minutes.**

**This hearing may not be cancelled without a Court Order.**

**DONE AND ORDERED** in Chambers in Palm Beach County, West

Palm Beach, Florida, this \_\_\_\_day of _____,2010.

SIGNED AND DATED

SEP 0 3 2010

_____
JUDGE DONALD W. HAFELE
HONORABLE GLENN KELLY
CIRCUIT COURT JUDGE

Copies furnished to:
Barry M. Silver, Esq., 1200 South Rogers Circle, Suite 8, Boca Raton, Fl. 33487
Carol Jean LoCicero, Esq., 400 N. Ashley Drive, Suite 1100, Tampa, FL 33602

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA - CIRCUIT DIVISION _____

Martin E. O'Boyle,
Martin E. O'Boyle, Jr.

CASE NO.: 50 2010 CA 012701
XXXX MB

_____
Plaintiff(s)

vs. South Jersey
Publ'g Co., et al.

_____
Defendant(s).

_____   /

## ORDER GRANTING/DENYING

THIS CAUSE came before the Court on Defendants' Motion to
Dismiss Plaintiffs' Complaint
_____

and the Court having heard argument of counsel, and being otherwise fully advised in the premises, it is

ORDERED and ADJUDGED that said motion be, and the same is hereby GRANTED/DENIED.

Martin O'Boyle, Jr. is dismissed without prejudice and without
leave to amend per Orlando Sports Stadium, 316 So. 2d 607 (Fla. 4th DCA 1975).
The Complaint is dismissed as to Martin O'Boyle, Sr.
pursuant to Fla. R. Civ. P. 1.130(a) and for failure to allege
constitutional fault. Mr. O'Boyle, Sr. shall have 20 days to amend.
The Court defers the remaining issues raised in Defendants' motion to
DONE AND ORDERED in Chambers at West Palm Beach, Palm Beach County, Florida, dismiss
this 19th day of _Nov._ , 20 10. until after the filing of the
amended complaint, if filed.

Names and addresses of
copies furnished to:

_____
Circuit Judge

Form 50

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT IN AND FOR
PALM BEACH COUNTY, FLORIDA

MARTIN E. O'BOYLE,
MARTIN E. O'BOYLE, JR.
      **Plaintiffs,**                **CASE NO. 502010 CA 012701 XXXX**
**MB**
**vs.**

SOUTH JERSEY PUBLISHING
COMPANY f/k/a/ ABARTACORP, d/b/a
THE PRESS OF ATLANTIC CITY
and PRESSOFATLANTICCITY.COM
      **Defendant.**
_____/

### AMENDED COMPLAINT FOR DEFAMATION

COMES NOW the Plaintiff, MARTIN E. O'BOYLE (hereinafter "O'BOYLE"), by undersigned counsel and sues the Defendants SOUTH JERSEY PUBLISHING COMPANY d/b/a THE PRESS OF ATLANTIC CITY, INC. and THEPRESSOFATLANTICCITY.COM (hereinafter "THE PRESS") and states:

1.    This case involves a claim by Plaintiff for damages in excess of $15,000, exclusive of costs, interest and attorney's fees.

2.    At all times material hereto, Plaintiff O'BOYLE was, and is sui juris and a resident of Palm Beach County, Florida.

3.    At all times material hereto, Defendant THE PRESS was and is a Pennsylvania corporation and news outlet that distributes and disseminates news in Palm Beach County, Florida, both as a newspaper and as an online version of the newspaper which appears all over the country and has its headquarters in Pennsylvania.

4.    At all times material hereto, O'BOYLE was and is a private citizen who takes interest in the affairs of his community, and who strives to hold government accountable in order to protect the community from fraud, government waste, and corruption.

5.    THE PRESS printed two defamatory articles about Plaintiff O'BOYLE.  The first such article attached hereto and incorporated herein as Exhibit A, appeared in The Press of Atlantic City on March 15, 2010 and was titled, "PART TWO: Lawyers, engineering firms, political operatives far outnumber average citizens in OPRA requests" written by Michael Clark, who wrote this article while working in the course and scope of his employment with Defendant.  The second article attached hereto and incorporated herein as Exhibit B, appeared in the Press of Atlantic City on March 16, 2010, was titled "Sen. Jim Whelan wants to put more N.J. records online" and was written by Eric Scott Campbell, while working in the course and scope of his employment with the Defendant. Both articles appeared simultaneously or close in time in the online version and these articles appeared all over the country, including in Palm Beach County, Florida.

6.    Pursuant to Florida Statute 770.01 as well as analogous statutes in New Jersey, on April 8, 2010, Plaintiff sent a letter demanding a retraction of the defamatory articles to the Defendant, in a letter which is attached hereto and incorporated herein as Exhibit C.

7.    To date, Defendant has failed to print a retraction or even to respond to Exhibit C.

8.    The statements are defamatory in that they portray Plaintiff in a false light, and they are false statements of fact which naturally and proximately subject Plaintiff to distrust, hatred, contempt, ridicule and obloquy, and/or cause the Plaintiff to be avoided, and/or they tend to injure the Plaintiff in his office, occupation, business and employment.

9.    When Defendant made all of the false statements described herein, its reporters knew or should have known that they were false, and/or that they put the Plaintiff in a false light.   The Defendant makes a profit by selling newspapers and gaining readers to its e-mail site and its newspapers, and thus, intentionally and knowingly made false statements of fact and/or created a false impression about the Defendant in order to create a more interesting and provocative story, even though they knew or should have known that the statements made about the Defendant in Exhibits A and B were false.

10.    Each of the statements described herein is false and defamatory taken individually. Each of the statements in Exhibits A and B taken as a whole is false and defamatory, and create the context in which each individual statement takes on a defamatory meaning.

11.    The first article is entitled "Lawyers, engineering firms, political operatives far outnumber average citizens in OPRA requests".   It prominently features Plaintiff O'BOYLE as a person making OPRA requests, and falsely claims that he is abusing the process.    Since O'BOYLE is not a lawyer or an engineering firm, according to the article, by process of elimination, O'BOYLE must be a "political operative", which has an extremely negative connotation, since most people today have a negative opinion of politicians, and the term "political operative" is a very highly charged pejorative term, which falsely characterizes the Plaintiff and places him in a false light.

12.    The false statements about Plaintiff and the false light in which he is depicted in the first article include, but are not necessarily limited to:

a)    Plaintiff's photograph was included with the caption, "'That's about as close to busting (chops) as you can get.    I'm going to do it solely for a point,' Longport

homeowner Martin O'Boyle says of his plans to file all of his OPRA requests in one form, giving the borough seven days to comply."

This quote was formed from two separate statements taken completely out of context. Additionally, the contention that Plaintiff planned to give the borough only seven days to comply with a combined OPRA request is in direct contrast to what Plaintiff actually told the reporter, Michael Clark.  The misuse of these words portrays the Plaintiff in a false light.

In addition, the Defendants knew the words were false because they possessed a tape of what the Plaintiff actually said, but intentionally chose to misquote him in order to defame the Plaintiff but make it a more salacious story in order to attract more readers and thus increase profits.

b)   The statement "But finding something specific may not be the goal of some public-document seekers.  For Martin O'Boyle, it's about bulk" falsely indicates that Plaintiff does not seek specific information with his requests and that his goal is merely to send as many requests as possible in order to harass the government and its employees.

c)   Mr. Clark states that "he (referring to Plaintiff) criticized the Borough for its inability to properly respond to his requests." This statement is untrue and defamatory.

d)   Mr. Clark's article states that the O'Boyle family was cited for zoning violations. This is untrue and defamatory.

e)   The article states that "Longport  officials say O'Boyle is using OPRA to intimidate and harass employees." This statement is untrue and defamatory.

f)   The article stated that "O'Boyle eventually admitted that not all of his requests are for vital information." This is untrue and defamatory.

g)      The article stated that "O'Boyle's dissatisfaction with the Borough's response to his requests has led to new plans for him to file all of his requests in one OPRA form, technically giving Longport officials just seven days to comply with dozens of requests under the law." This statement is untrue and defamatory.

h)      The article says that O'Boyle stated "That's about as close to busting chops as you can get." This statement was taken out of context, and the rest of the statement was omitted in order to create a false impression and place the Plaintiff in a false light. Thus, this statement is defamatory.

i)      The article says that O'Boyle stated, "I'm going to do it solely to for a point." This statement was taken out of context in order to create a false impression and to place the Plaintiff in a false light. Thus, the statement is defamatory.

j)      The article claims that O'Boyle stated, "If they're doing things wrong and their conduct is affecting you and/or your family, why can't you do it forever?" This statement is untrue, casts Plaintiff in a false light, and is therefore defamatory.

13.     The statement that is defamatory in the second article includes, but are not necessarily limited to the statement that O'Boyle is on a "crusade to 'bust chops' in Longport Borough Hall." This statement is false, places Plaintiff in a false light, and is defamatory. Moreover, this statement reinforces the defamatory statements made in the first article, and by its repetition, increases the harm to the Plaintiff from both articles.

14.     The second article also begins to take on a life of its own, and reinforces the negative effect of the first article, since people tend to remember and believe statements that are repeated in the press, even if they are false on both occasions.

15.     Moreover, in the minds of some people, the word "crusade", which was used to describe Plaintiff's activities, has a very negative connotation, since it is often associated with irrational religious zealots, who are blinded by emotion, and dangerous to others.

16.     All of the defamatory statements described above, were also disseminated by the Defendant via the internet by the Pressofatlanticcity.com, which reinforced the negative impact of these statements by repetition, which for some increases their believability.

17.     As a result of the defamatory statements described herein, the Plaintiff has been harmed, and suffered damages which include, but are not limited to emotional distress from his being defamed and demeaned along with his family, loss of reputation, loss of business opportunities and income, and other unspecified damages.

18.     All conditions precedent have been met prior to bringing this cause of action, including but not limited to compliance with the notice provision of Florida Statute 770.01.   Thus, Plaintiff seeks all damages provided by Fla. Stat. 770.01 et seq.

19.     The Plaintiff has retained the undersigned to represent him in this matter and has agreed to pay him a reasonable fee for his services.

WHEREFORE, Plaintiff demands damages, plus interest, costs, attorney's fees, and any other remedy deemed just and proper by this Honorable Court.

I CERTIFY that a copy of the foregoing was sent by e-mail to Carol Jean LoCicero, Esq., 400 N. Ashley Dr., Suite 1100, Tampa, Fl. 33602, and Deanna Shullman, Esq., 8461 Lake Worth Road, Suite 242, Lake Worth, Fl. 33467 this December 9, 2010.

BARRY SILVER, ESQ.  FBN#382108
1200 South Rogers Circle     Suite 8
Boca Raton, Florida
(561) 483-6900

## IN THE CIRCUIT COURT OF THE 15ᵀᴴ JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA

MARTIN E. O'BOYLE,
MARTIN E. O'BOYLE, JR.
    Plaintiffs,             **CASE NO.: 502010CA12701XXXXMBAB**

vs.

THE PRESS OF ATLANTIC CITY, INC.
and PRESSOFATLANTICCITY.COM
    Defendants.
_____/

### NOTICE OF FILING

COME NOW the Plaintiffs, by and through undersigned counsel and hereby file

Exhibits A, B, and C that where inadvertently not filed with the Amended Complaint on

December 9, 2010.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

furnished on this *13th* day of December, 2010, U.S. Mail and/or email to:  Carol Jean

LoCicero, Esq., Thomas & LoCicero, PL, 400 North Ashley Drive, Suite 1100, Tampa,

FL  33602.

Barry Silver, Esq. / FBN: 382108
1200 South Rogers Circle, Suite 8
Boca Raton, FL  33487
561-483-6900 – Telephone
561-488-4676 – Facsimile
barryboca@aol.com – Email



**pressofAtlanticCity.com**

This is for personal, noncommercial use only.

To search archives, visit

pressofatlanticcity.com/archives



# OPEN PUBLIC RECORDS
## Flaws, Features - Future?

## PART TWO: Lawyers, engineering firms, political operatives far outnumber average citizens in OPRA requests



PART TWO: Lawyers, engineering firms, political operatives far outnumber average citiz... Page 2 of 3

'That's about as close to busting (chops) as you can get. I'm going to do it solely for a point,' Longport homeowner Martin O'Boyle says of his plans to file all of his OPRA requests in one form, giving the borough seven days to comply.

Photo by: Anthony Smedile



# pressofAtlanticCity.com

This is for personal, noncommercial use only.

To search archives, visit

pressofatlanticcity.com/archives



# OPEN PUBLIC RECORDS
## Flaws, Features – Future?

## PART TWO: Lawyers, engineering firms, political operatives far outnumber average citizens in OPRA requests

By MICHAEL CLARK Staff Writer | Posted: Sunday, March 14, 2010 |

The Open Public Records Act, or OPRA, was intended to make government more accessible to the average citizen. But officials' accounts and reviews of OPRA requests to area governments show the law has largely become a tool of businesses, lawyers, and developers.

Consultants and other professionals clog municipal offices with requests for zoning documents, financial disclosure forms and police reports. And the law meant to subject government to the light of scrutiny can sometimes be used for shady political purposes.

In 2007, then-Atlantic County Democratic Chairman Ron Ruff requested information on travel expenses for Atlantic County Executive Dennis Levinson, a Republican who was seeking re-election, and a female employee in his office. The request asked for documents about their dining arrangements and hotel accommodations.

There were no such records. But by asking, Levinson said a political broadside was fired and the rumor mill in county offices began turning. Levinson, who was then running for re-election against Democrat James McGettigan, said he has never submitted a single expense for government travel.

"It was a slimy tactic to imply some sort of relationship there, to smear my name and my reputation," Levinson said. "The OPRA law was created to allow citizens access to public documents. But this is what they use it for, their opposition research. And they also use it to harass. I mean, look at this. They'll try to ruin your family."

A review by The Press of Atlantic City of records requests made of area agencies shows relatively few come from private citizens. Requests to Atlantic City government during the past year mostly came from attorneys seeking copies of tort claims, incident reports and property records.

At state agencies, the situation is not much different.

The New Jersey Department of Environmental Protection determined in 2008 that it received the most OPRA requests of any state department since the law's inception in 2002, with 69,000 records requests. The department with the next highest number — Law and Public Safety — received 6,200 requests.

Nearly two in three OPRA requests at state agencies were directed to the DEP, which handled 12,434 cases last year. The agency estimates it spent $18 million between 2002 and 2008 fulfilling records requests.

The vast majority of those requests — 97 percent — were from consultants, lawyers and businesses. Members of the public accounted for just 1 percent of the records requests from 2002 to 2008, the DEP found.

"There are companies out there, professionals, who, rather than doing their own homework, may choose to use OPRA as a one-stop shop," DEP spokeswoman Elaine Makatura said. "It runs the gamut — consultants, businesspeople, legal requests. It's a democratic process, but it should not be abused."

Requests from people and corporations from outside New Jersey also cost the state hundreds of thousands of dollars each year. In a 2008 report, the DEP said 21 percent of its requests came from parties outside the state, amounting to more than $700,000 in annual costs.

"The requesters benefit from accessing the NJDEP's records but, unlike New Jersey's taxpayers, do not bear any of the costs incurred in administering the NJDEP's OPRA program," the report reads.

Ron Miskoff, president of the New Jersey Foundation for Open Government, said New Jersey residents may be discouraged from using OPRA because they are repelled by the "siege mentality" taken by local government employees.

The employees "feel that if a request comes in and it doesn't work, (the clerks) just deny it without any further explanation," he said. "There's an education process that people need to get acquainted with, but they're not getting it from people that know the law. And then everybody just gets frustrated."

Last year, those requests were filed mostly by the Democratic campaign, which had sought records on the salaries of various township employees.

Vineland City Clerk Keith Petrosky said election season is a grueling time for his department.

"You get these political operatives who just want to tear apart their opponents," Petrosky said. "In most cases, they don't even find what they're looking for, because nothing's there."

**The O'Boyle factor**

But finding something specific may not be the goal of some public-document seekers. For Martin O'Boyle, it's about bulk.

O'Boyle, a Florida resident with a home in Longport, has obtained plenty of documents from the borough. He has long since lost count but said, "It's got to be in the thousands."

In 2009, Longport, a small shore borough with a population of slightly more than 1,000, received 857 OPRA requests at Borough Hall. That number far exceeds the 514 total requests received during the same year in Atlantic City, which has nearly 40 times Longport's population and is commonly subject to OPRA requests.

Of the requests in Longport, 684 came from O'Boyle, a member of his family, or one of his businesses or organizations. That's equivalent to 80 percent of the borough's requests.

O'Boyle said the requests are for reasonably obtainable information. He criticized the borough for its inability to properly respond to his requests, which sometimes are filed 10 or more at a time. But his opponents in Longport say his requests are being used to settle a score with municipal officials.

The battle between the O'Boyles and the borough began when the family was charged with a zoning violation at their home in 2006, allegedly for having illegal living space on the first floor. O'Boyle then began requesting documents regarding the citation and later succeeded in getting the violation dismissed. But the requests have not stopped since then.

Longport officials say O'Boyle is using OPRA to intimidate and harass government employees, similar to the tactics he has used in the civil court system. In November 2006, a Tennessee court issued more than $1.2 million in sanctions to O'Boyle for engaging in frivolous litigation "that would maximize the inconvenience and cost to the defendants," Judge W. Dale Young of Blount County, Tenn., wrote in his opinion.

A few months later, Young overturned most of the financial penalties against O'Boyle but insisted on a $5,000 penalty to the courts.

Longport Mayor Nick Russo, the latest city leader at odds with O'Boyle, said he has concerns about the privacy of his residents as it relates to O'Boyle's requests. He pointed to various

requests for Russo's e-mails to or from residents, who he said could be scared off if they learn their private e-mail addresses have been released.

"Will that have an adverse effect on participating" in government? Russo asked. "I think that has an adverse effect and doesn't attain the goal that we're all trying to achieve, and that goal is for public participation."

O'Boyle eventually admitted that not all of his requests are for vital information.

"If I were to thumb through and look at all of the OPRA requests, I might look at one and say, 'I don't know what I was thinking when I made that one,'" he said.

O'Boyle's dissatisfaction with the borough's response to his requests has led to new plans for him to file all of his requests in one OPRA form, technically giving Longport officials just seven days to comply with dozens of requests under the law.

"That's about as close to busting (chops) as you can get," O'Boyle said. "I'm going to do it solely for a point."

But he continues to contend that his overall reasoning is not to prove points but to get important information. And it does not appear that O'Boyle's requests will end any time soon.

"If they're doing things wrong and their conduct is affecting you and/or your family," he said, "why can't you do it forever?"

### A kindler, gentler OPRA request

Some people still use OPRA according to the law's original intent.

When Ventnor resident Charles Cannon Jr. saw a school district employee shooting video of the old Atlantic City High School before its demolition in 1999, he yearned to see the footage.

Cannon, a 1956 graduate of the school, collects memorabilia of all things Atlantic City. He wanted to remember his alma mater before it would become a parking lot off Albany Avenue.

"I took pictures with my camera inside, but not video. I just thought it would be nice to have video to go with it," he said.

Cannon sent an OPRA request to the Atlantic City Board of Education for copies of the tapes. He already had the school's old class bell, as well as yearbooks and graduation programs. The board said it did not have any such video. But Cannon knew better.

He appealed to the Government Records Council and, more than a year after the request, finally prevailed.

"After a year, they came up with the tapes of the outside, eight hours of footage," he said.

Cannon said he thinks there are more tapes, referenced in the video he has, that elude his grasp. Still, he was happy with his victory.

But requesters such as Cannon are uncommon.

Russo equates OPRA to the laws allowing absentee and messenger ballots, an alternative to traditional voting designed to help out-of-town or disabled voters that has been manipulated to benefit politicians throughout Atlantic County.

"When these laws were first created, it was a wonderful concept. It gave everyone the ability to vote. But the law was abused, and it had to be changed," Russo said. "I think we have the same exact situation with OPRA — a great concept for openness, but it's being abused."

*Staff writers Michael Miller, Daniel Walsh and Lee Procida contributed to this report.*

Contact Michael Clark:

609-272-7204

Michael.Clark@pressofac.com
© 1970-2010 Press of Atlantic City Media Group



# pressofAtlanticCity.com

This is for personal, noncommercial use only.

To search archives, visit

pressofatlanticcity.com/archives



# OPEN PUBLIC RECORDS
## Flaws, Features - Future?

## Sen. Jim Whelan wants to put more N.J. records online

By ERIC SCOTT CAMPBELL Staff Writer | Posted: Tuesday, March 16, 2010 |

State Sen. Jim Whelan is renewing his push to require government agencies in New Jersey to make records available online.

"I think we all recognize that ultimately, this is the future," Whelan said at a Senate State Government, Wagering, Tourism & Historic Preservation Committee hearing Monday afternoon in Trenton. "This stuff's going to have to be on electronic record somewhere, and we've got to figure out how to get there."

Whelan, D-Atlantic, pitched the bill in January 2008 but it never left the state government panel. Now, as chairman of that committee, he is collecting feedback from those who would be affected.

"If all documents are to be posted, (school) districts will incur more costs in staff and equipment," said John Burns, counsel for the New Jersey School Boards Association, at Monday's hearing.

Whelan said Open Public Records Act hard-copy requests already are burdening some municipalities, such as Longport. The Press reported Monday that the tiny beach town had 857 OPRA requests last year, many more than Atlantic City, its neighbor with a nine-figure annual budget. Most of those requests came from one person, Longport homeowner Martin O'Boyle.

"I didn't plant this article. I don't have that much influence," Whelan said jokingly.

Longport Mayor Nick Russo testified about the need to alleviate his borough's OPRA burden, the Internet notwithstanding.

"The more requests that are made, the greater the chance we'll make a mistake," Russo said.

Catherine Starghill, director of the Government Records Council, called O'Boyle's crusade to "bust chops" in Longport Borough Hall with his numerous OPRA requests "probably the most egregious scenario that I've heard of."

With government budgets tight statewide, Russo wondered who would pay for new document scanners and, possibly, more staffing time required.

Whelan said after the hearing, "Ultimately, I think this (online) stuff saves money. I think it helps Nick Russo."

The senator's bill would require posting old records within two months of the bill's passage and posting new records within a month of their creation.

"What is a government record?" Russo said to The Press after the hearing. "If it's everything with the definition they now use, I don't know how we'd be able to get everything online in 60 days. If you e-mail me today, do I have to have that online immediately? I don't think any of us are averse to this, we just have to come up with some kind of reasonableness."

Absecon, which gets far fewer requests than Longport, is trying to make substantially more records available on its Web site this year, City Council President Lynn Caterson said.

"It's a work in progress," Caterson said. "We're not near to perfection yet, but it's very user-friendly. The hope is that anyone who wants a public record can more easily access it. Some people may well access it who don't want to go to the trouble of an OPRA request."

Caterson said she wondered whether agencies would have difficulty meeting the one-month deadline when minutes aren't immediately approved or meetings are postponed. Whelan said he would not hurry the bill to a vote.

"We're not holding it to hold it. We're holding it to make changes, and hopefully we'll get it right," Whelan said.

Contact Eric Scott Campbell:

609-272-7227

ECampbell@pressofac.com

© 1970-2010 Press of Atlantic City Media Group



**COMMERCE GROUP**

■   ■   ■   ■   ■

moboyle@commerce-group.com
Direct Dial Telephone #954-570-3505

April 8, 2010

<u>VIA UPS DELIVERY #1Z986W8Y0190243285</u>
<u>TELEPHONE #609-272-7000</u>

Press of Atlantic City
1000 West Washington Avenue
Pleasantville, NJ 08232

Re:   OPRA Series – Week of March 15, 2010

Dear Ladies and Gentlemen:

Please accept this letter as a written demand that The Press of Atlantic City and
the Pressofatlanticcity.com (individually and collectively referred to as "The
Press") print a Retraction (as defined below) in connection with those portions of
the articles in the OPRA series featured on Monday March 15, 2010 (the "First
Article") and Tuesday, March 16, 2010 (the "Second Article").

Demand is made that The Press, publish an article or articles containing a full
and fair correction, apology, or retraction ("Retraction") within ten (10) days in
the same editions or corresponding issues of the newspaper or periodical in
which said article[s] appeared and in as conspicuous place and type as said
original article.

The articles in question were titled "PART TWO: Lawyers, engineering firms,
political operatives far outnumber average citizens in OPRA requests" by
Michael Clark and "Sen. Jim Whelan wants to put more N.J. records online" by
Eric Scott Campbell.

Among the reasons for the Retraction are, *inter alia*:

A. Regarding the first article, "PART TWO: Lawyers, engineering firms, political
operatives far outnumber average citizens in OPRA requests":

(1) My photograph was included with the caption, "'That's about as close to
busting (chops) as you can get. I'm going to do it solely for a point,' Longport

Press of Atlantic City
April 8, 2010
Page 2

---

homeowner Martin O'Boyle says of his plans to file all of his OPRA requests in one form, giving the borough seven days to comply." The quote was formed from two separate statements taken completely out of context. Additionally, the contention that I plan to give the borough only seven days to comply with a combined OPRA request is in direct contrast to what I actually told the reporter, Michael Clark. The words above were also used within the text of the article. The misuse of these statements which I believe was intentional, portrays me in a false light and is defamatory.

(2) The statement "But finding something specific may not be the goal of some public-document seekers. For Martin O'Boyle, it's about bulk" indicates that I do not seek specific information with my requests and that my goal is merely to send as many requests as possible. These assertions are untrue and defamatory.

(3) Mr. Clark states that "he (referring to Martin O'Boyle) criticized the Borough for its inability to properly respond to his requests." This statement is untrue and defamatory.

(4) Mr. Clark's article alleges that the O'Boyle family was cited for zoning violations. This is untrue and defamatory.

(5) In the article, the writer states "Longport officials say O'Boyle is using OPRA to intimidate and harass employees". This statement is untrue and defamatory.

(6) The statement "O'Boyle eventually admitted that not all of his requests are for vital information" was untrue.

(7) "O'Boyle's dissatisfaction with the Borough's response to his requests has led to new plans for him to file all of his requests in one OPRA form, technically giving Longport officials just seven days to comply with dozens of requests under the law". This statement is untrue and defamatory.

(8) "That's about as close to busting chops as you can get" O'Boyle said. "I'm going to do it solely for a point". This statement was made out of context, is defamatory, is untrue (as presented) and presents me in a false light.

(9) "If they're doing things wrong and their conduct is affecting you and/or your family," he said, "why can't you do it forever?" This statement is untrue and defamatory.

Press of Atlantic City
April 8, 2010
Page 3

B.      Regarding the Second Article, entitled, "Sen. Jim Whelan wants to put more N.J. records online":

(1) In the article by Mr. Campbell, the author states that I am on a "crusade to 'bust chops' in Longport Borough Hall." This statement clearly frames me in a false light, has no basis in fact, and defames me.

The above list should not be construed to be all inclusive; but, as you can see, they demonstrate that, at a minimum, The Press owes me and my family a Retraction. The bases for each of the statements above are for illustration purposes and should not be construed to be limited. As stated above, I believe the misuse of the statements enumerated herein were done intentionally.

We sincerely hope that The Press will recognize its improper conduct and issue the appropriate Retractions in a timely fashion.

We thank you for your consideration. We look forward to your "righting this wrong".

Sincerely yours,

Martin E. O'Boyle

cc:     Neill Borowski, Executive Editor – Via Telecopy #609-272-7280
        Michael Clark, Staff Writer – Via Telecopy #609-272-7224
        Keith Dawn, Publisher – Via Telecopy #609-272-7413

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

MARTIN E. O'BOYLE, et al.,

    Plaintiffs,

vs.                            Case No.:  50 2010 CA 012701 XXXX MB

SOUTH JERSEY PUBLISHING
COMPANY f/k/a ABARACORP,
d/b/a THE PRESS OF ATLANTIC
CITY and PRESSOFATLANTICCITY.COM

    Defendant.

_____/

## DEFENDANT SOUTH JERSEY PUBLISHING COMPANY'S
## FIRST REQUESTS FOR ADMISSION

Defendant South Jersey Publishing Company, publisher of the *Press of Atlantic City* and

PressofAtlanticCity.com ("The Press"), by and through its undersigned counsel and pursuant to

Rules 1.280 and 1.370, Florida Rules of Civil Procedure, hereby propounds the following

requests for admission to Plaintiff Martin E. O'Boyle ("Plaintiff") to be answered in writing, and

under oath.

### Definitions

The following definitions apply to these requests.

1.      "Plaintiff," "you" and "your" refers to Martin E. O'Boyle, including his agents,

attorneys, employees, representatives, heirs, and any and all other persons or entities acting or

purporting to act or to have acted on behalf of any of them during any time period referred to in

these interrogatories.

2.      Concerning and Relating shall be construed in the broadest sense and shall mean

directly or indirectly describing, discussing, mentioning, commenting upon, or referring to the

subject or topic in question, either in whole or in part.

3.    As used herein, the masculine includes the feminine and the singular includes the plural, and vice versa.

4.    <u>Any</u> and <u>all</u>; <u>every</u> and <u>each</u>:  As used herein, the word "any" includes the word "all" and the word "all" includes the word "any."  "Each" includes the word "every" and "every" includes the word "each."

5.    <u>And</u>; <u>or</u>:  "And" as well as "or" shall be construed conjunctively or disjunctively as necessary in order to bring within the scope of these requests for production any information which might otherwise be construed outside their scope.

ADMISSIONS

1.    Admit that you are seeking actual damages in this matter in excess of $75,000.

**Response:**


2.    Admit that you are not seeking actual damages in this matter in excess of $75,000.

**Response:**


Respectfully submitted,

THOMAS & LOCICERO PL


Carol Jean LoCicero
   Florida Bar No. 603030
Paul R. McAdoo
   Florida Bar No. 0036219
400 N. Ashley Drive, Suite 1100
Tampa, FL 33602
Telephone: (813) 984-3060
Facsimile:  (813) 984-3070
clocicero@tlolawfirm.com

2

pmcadoo@tlolawfirm.com

and

Deanna K. Shullman
  Florida Bar No. 0514462
8461 Lake Worth Road, Suite 242
Lake Worth, FL 33467
Telephone:  (561) 340-1433
dshullman@tlolawfirm.com

Attorneys for The Press

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished

on this 20th day of December, 2010, via ☐ E-Mail; ☒ U.S. Mail; ☐ Facsimile; ☐ Overnight

Delivery to Barry M. Silver, Esq., 1200 S. Rogers Circle, Suite B, Boca Raton, FL  33487.

_____
Attorney

3

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT IN AND FOR
PALM BEACH COUNTY, FLORIDA

MARTIN E. O'BOYLE,
MARTIN E. O'BOYLE, JR.
    Plaintiffs,               CASE NO.: 502010CA12701XXXXMBAB
vs.

THE PRESS OF ATLANTIC CITY, INC.
and PRESSOFATLANTICCITY.COM
    Defendants.
_____/

## RESPONSE TO REQUEST FOR ADMISSIONS

COME NOW the Plaintiffs, by and through undersigned counsel and hereby deny

each and every Request For Admissions.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

furnished on this _7th_ day of January, 2011 by U.S. Mail to Carol Jean LoCicero, Esq.,

Thomas & LoCicero, PL, 400 North Ashley Drive, Suite 1100, Tampa, FL 33602.

                                      Barry Silver, Esq. / FBN: 382108
                                      1200 South Rogers Circle, Suite 8
                                      Boca Raton, FL 33487
                                      561-483-6900 – Telephone
                                      561-488-4676 – Facsimile
                                      barryboca@aol.com -- Email